In the Matter of the Custody of MARY M. FORBELL, an Infant. ROBERT FORBELL, Petitioner; MONICA R. FORBELL, Respondent.

Supreme Court, Special Term, Kings County, June 23, 1950.

*Charles Trynin* for petitioner.

*Cornelius Bregoff* for respondent.

F. E. JOHNSON, J. The resumption of the hearing that terminated in an order in the latter part of June, 1949, which was vacated on an appeal and wherein it was directed that the Special Term should proceed further herein, and take testimony on the subject of the custody of the child, etc. (*Matter of Forbell* v. *Forbell,* 276 App. Div. 785) has been had.

All testimony offered on behalf of the mother has been taken, despite what seemed the obvious irrelevancy and remoteness of some of it, but the testimony for the father has been frequently limited by rulings; it is probably conducive to a better understanding of the situation disclosed to have various topics and branches of the proof treated separately.

*Events Since the June 24, 1949, Order:*

1. While that order was on appeal the mother surrendered the child (August, 1949) to the father, who took her to his permanent residence in Florida, where he and she and his mother have since been residing.

2. A trial of the mother's separation suit, brought in 1945 in Richmond County, was had in March, 1950, and final judgment entered June 7, 1950, on a filed decision dated May 12, 1950, which upholds the 1948 Florida decree dissolving the marriage, dismissed her action, and refused to entertain her application for custody under section 1170-a of the Civil Practice Act. (Portion of opinion here omitted as being factual and of subordinate importance.)

*Jurisdiction of the Florida Court Over the Child at the Time of the 1948 Decree:*

The husband sued there as a permanent resident, after the mother, without his permission, had taken the child with her to New York in May, 1947; thereafter, while the child was still in New York a decree giving him custody was entered; the mother now claims that the Florida court *then* had no power to make that custody award. If, *regardless of the reasons* why her mother took the child out of Florida, that absence prevented the Florida court from awarding her custody to the father even though the court had jurisdiction over *both* parents, under *Williams* v. *North Carolina* (317 U. S. 287; 325 U. S. 226), the need to continue this hearing would seem to disappear.

But the Appellate Division, knowing the foregoing facts, ordered the hearing to continue. (*Matter of Forbell* v. *Forbell, supra,* p. 786.) The entire situation, *up to the time of the June 25th order in this proceeding,* was fully set forth, not only in the original files (presented in lieu of a printed record), but in elaborate briefs, and that court directed that the *factual* question of custody should be tried. If, since its rendition, the Florida decree was invalid as to custody, then the order herein reversed should have been held invalid and a dismissal of this proceeding ordered on the ground that he had no custody decree that was entitled to full faith and credit, but had one void for lack of jurisdiction of the child. Thereupon the then outstanding *pendente lite* custody order in the separation suit should stand and the custody should have been confirmed in the mother.

It is apparent that the right answer to this problem rests upon the fact that the child's *residence and domicile* at the time that her mother took her north, *was that of the father* as a matter of law. If the mother could then divest the child of that residence it would have to be on *grounds that warranted her leaving the husband.* However, it has been duly adjudicated, by now unquestionable decree which must, under the *Williams* ruling (*supra*) be accepted as conclusive that she did *not* have the right to leave her husband, but that she *baselessly deserted* him.

Under such circumstances the New York authorities agree that the child's residence remained that of her father, since it is not the *mere removal* of the child by a mother that can change the child's residence from that of the father. The authorities also agree that when an attempted change of the mother's residence takes place *without legal excuse,* or without *factual*

justification from the standpoint of the *child's* best interests, the effort to change the child's *residence* fails. In the situation disclosed, by all the proof and the files in the evidence, that seems to be true of this case, and the findings of the Master citing the Florida law to that effect are quoted in the father's printed appeals briefs.

The sound conclusion, therefore, seems to be that the mother's 1948 adjudicated *unjustified taking* of the child from the jurisdiction where the father permanently resided could have no effect in giving the child a valid residence or domicile in New York even though she was thereafter physically present here and, in the broad sense of the word, *resided* here.

After she was brought here, but at a time when the lack of legal or factual ground for taking her out of Florida had *not yet* been the subject of a binding decree, this court *because she was physically present* and no decree had yet been rendered in the then pending separation action took jurisdiction and awarded it to the *resident* mother. When thereafter, in that separation pending suit of the mother a decision has been arrived at on the subject of custody contrary to that temporary order previously so made, no one can question that the *later decree would be controlling* over any such order *pendente lite.* For the same reason (and for the additional reason of the *Williams* ruling, *supra*) no one is now able to question that the later, and undeniably valid foreign decree, is controlling when it *also* adjudicated the wrongfulness of the mother's departure and, by its custody direction, the wrongfulness of her taking the Florida residing child from the Florida residing father.

*The Burden of Proof, Upon the Mother, Who Seeks to Change a Custody Decree:*

All of her March, 1950, charges of unfitness *precede* the 1948 Florida decree and no attack on him is made by evidence of any *new* situation *since* the decree, while the New York policy seems to be to limit the review of the foreign decree custody provision to facts arising thereafter. The Florida decree was entered in 1948, but nothing has been presented on this hearing of any factors that have arisen *since* that decree (as required by the Court of Appeals decisions) that would affect the propriety of the award to the father, or which would indicate that if the Florida court were *now apprised of them, it might reasonably be expected to modify its 1948 custody provision.*

The Court of Appeals in *People ex rel. Herzog* v. *Morgan* (287 N. Y. 317) unanimously reversed the holding (262 App.

Div. 763) that the foreign decree be modified because it gave the father the child's company for too long a time; the Appellate Division decision was *not* because of *changed* conditions; the Special Term decision (based on *Ansorge* v. *Armour,* 267 N. Y. 492), had been that in order to modify the decree there must be shown " change in conditions and circumstances *since* the rendering of the decree "; this was approved by the Court of Appeals, and the refusal of Special Term to change the decree was approved by the reversal. The refusal in another *Herzog* decision (*Matter of Herzog,* 192 Misc. 352, 357) of Special Term to alter a foreign decree " in the absence of a showing that circumstances have altered *since* the entry of the Florida decree " (italics supplied) was approved (275 App. Div. 917). These two *Herzog* cases, six years apart, show consistency of attitude on this question by appellate courts.

*Matter of Young* v. *Roe* (265 App. Div. 858) held there could be a modification " if intervening and current circumstances have *changed* " (italics supplied); *Matter of Jiranek* (267 App. Div. 607, 610) held it could be modified " when * * * there has been a change of circumstances *since* the decree." (Italics supplied.) The Supreme Court was careful to say in the *Halvey* case (*New York ex rel. Halvey* v. *Halvey,* 330 U. S. 610, 617) that custody modification could be had in another State where the *law of the State* permits such decree to be reconsidered in the light of facts which have arisen *since* the decree. New York *does* allow a reconsideration under *such* circumstances, but does *not* allow it as to facts happening *before* the decree; thus the remainder of that quotation (" or which were not presented or considered at the time it was made ") is not pertinent here, since *in New York that pre-decree situation is not investigated unless* the child's situation makes it " necessary."

The law of New York limits application for revision to *new* matter, and does not go *behind* the decree; some States may have a different *policy,* and this final *Halvey* language was undoubtedly used because all States do *not* have the same policy thereon. The only New York *Halvey* opinion was at Special Term (*People ex rel. Halvey* v. *Halvey,* 185 Misc. 52), and the New York law there *stated was approved on all three appeals;* what did BENVENGA, J. say? Merely that the foreign decree on custody is binding in New York and " a change of custody will not be decreed unless *circumstances arise* that make it *necessary* for the best interests of the child," (p. 53, citing the

*Ansorge* ruling of the Court of Appeals, 267 N. Y. 492, *supra*); he also cited *People ex rel. Tull* v. *Tull* (245 App. Div. 508, 510) which held that the application to change the foreign decree " discloses no such lapse of time or *change of conditions,* factual or legal, as would justify " modifying it (italics supplied) and the Court of Appeals affirmed unanimously and without opinion (270 N. Y. 619) the memorandum of the court's decision citing its affirmance of *Matter of Standish* (233 N. Y. 689, affg. 197 App. Div. 176) where the Appellate Division reversed the lower court, a catchline preceding the Appellate Division opinion reading: " No *change in conditions* shown authorizing change in custody." (Italics supplied.) What Justice BENVENGA did was not to modify the *custody but to confirm it* and merely award *visitation,* a subject that had not been passed upon in the decree.

In *Mahaffey* v. *Mahaffey* (219 S. W. 2d 519, 521 [Tex. Civ. App.]) the Texas court, speaking of the constitutional force behind a foreign decree, says that another jurisdiction, where it is sought to change the decree custody " did not have such authority because no *change of conditions* was shown such as would justify a modification of the judgment of " the decree court, and that " full faith and credit should be given the " foreign decree " until *good and sufficient cause* has been shown for modifying it." (Italics supplied.)

*The Jurisdiction of This Court to Decide on Custody of a Child Who is and for Nine Months has been, Residing and Domiciled with a Permanent-Resident Parent in Another State.*

If the only questions here were *factual* and related to the good of the child, the foregoing comments on that subject would dispose of the questions; however, there are legal questions, that ought to be discussed first, relating to the court's *present* jurisdiction of the child.

The novel question of what power State courts have to pass upon the custody, etc., of those outside the State has just received clarification in the United States Supreme Court; on June 5, 1950, that court said in cases where writs were sought to review the status of nonresidents:

" We are cited to no instance where a court, in this or any other country where the writ is known, has issued it on behalf of an alien enemy *who, at no relevant time or in no stage of his captivity, has been within its territorial jurisdiction. Nothing in the text of the Constitution extends such a right,* nor does anything in our statutes. * * *

" But even by the most magnanimous view, our law does not abolish *inherent distinctions* recognized throughout the civilized world between citizens and aliens, nor between aliens of friendly and of enemy allegiance, *nor between resident* enemy aliens who have *submitted themselves to our laws* and *non-resident* enemy aliens who at all times have remained with, and adhered to, enemy governments." (*Johnson* v. *Eisentrager,* 339 U. S. 763, 768, 769; italics supplied.)

In the mother's New York separation action she obtained a default judgment (after her husband, a Florida resident, was served in 1945 by strategem in New York); although in the complaint she had asked " that the plaintiff be awarded custody of the said issue of marriage " *no award of custody was made in that judgment,* and it is apparent (from the minutes) that Mr. Justice NORTON recognized the effect of the child being then with her father *in Florida.* (He has said in *Young* v. *Roe,* 58 N. Y. S. 2d 629, 630, that jurisdiction rested on the *child's residence,* not the parent's domicile.)

When, pursuant to the order of June 24, 1949, herein the child was delivered by the mother to the father (in August at which time there was outstanding an order adjudging her in contempt for her failure to honor the directions of the court) a bond was given by the father to produce the child here *on the court's request;* the child was then taken to Florida where she has remained continuously.

The later (November 29, 1949) decision of the Appellate Division does not *make any reference to the circumstances under which the child was to be delivered to the father;* it said only that this court has " power to determine custody of the child *by virtue of her residence here* " (citing cases).

Was it thus intended that the question of custody should be further inquired into if the child was no longer in the State?

However, *in none of the cases there cited, did the court pass upon the custody of the infant who was not within the State.* Whatever the mother's claim may be to have the question of custody further looked into in this proceeding in March, 1950, by reason of her claims of the father's unfitness, etc., it must rest upon either (1) the *supposed continuance of jurisdiction* of the child even though the child has departed, or (2) the *supposed continuance of the presence of the child in the State.* The latter would be pure fiction, and can hardly be taken seriously; the former seems not sound because a *state of facts* that gives jurisdiction surely has to *continue.*

The mother's argument that the Florida court had no jurisdiction in 1948 because the child was in New York is now equally good here against her, and amounts to no jurisdiction *now* because the child *is*, and since August, 1949, has been *absent*, not only with her father in his permanent residence but in the State which, by decree, gave her to him. If the child, though physically absent, is still subject to the jurisdiction of this court why was she, absent, not equally subject to the 1948 Florida court that had undoubted jurisdiction of her father?

The Supreme Court, in the *Halvey* case (330 U. S. 610, *supra*) held: " The legal domicile of the child is usually the domicile of his father. [citations] The power of the Florida courts to award custody of a child is dependent either on the child being *legally domiciled* in Florida *or* physically *present* there. [citations] " (Footnote, p. 615; italics supplied.) Apparently, the physical presence of the child was not necessary in the divorce action *if the child is out of the State illegally, since the domicile of Forbell,* a resident of that State, *being the domicile of the child,* the child's absence without his consent does not prevent the Florida court the domicile court from making a decree affecting the child. (See, also, 27 C. J. S., Divorce, § 332, p. 1291; Restatement, Conflict of Laws, §§ 117, 145–148; 2 Beale on Conflict of Laws, p. 717, and Goodrich on Conflict of Laws, § 131.)

To say we are to *continue* jurisdiction of the child because the child was here when the proceedings was begun and, therefore, the propriety of custody can be re-examined *even after the child has departed,* would seem to ignore the elementary rule of an equity court, that a decision is made on the *circumstances existing at the time of the decision.*

We are here asked to continue to re-examine the circumstances surrounding a child who has been duly adjudicated to be subject to the Florida court, who before that was an undoubted resident of Florida, legally domiciled there who is now a resident of Florida legally domiciled there, and who has not been in this State for seven months before the March, 1950, hearing. If that is true we may get into the somewhat ridiculous position of having the Florida court thereupon reaffirm its decree, invalidate any order made in this court *under the very theory on which the mother is here proceeding,* i.e., the subject of custody is never closed. It seems undignified for this State to ever enter into any such race, and this seems to be, emphatically, not a case where doing so could be either justified or excused.

It is true that, although the *June,* 1949, *order appealed from* contained nothing about the *August,* 1949, surrender and bond, and also contained nothing about the child's later departure from New York and return to Florida, on the last page of the mother's printed brief reference was made to the bond; the court, however, ignored it.

She asked the Appellate Division to follow the procedure in *Young* v. *Roe* (58 N. Y. S. 2d 629, *supra*) discussed in her brief. In that case the child was *residing* in New York at the time of the hearing of the writ and the mother and father were *also* living in New York; NORTON, J., gave the child back to the mother (to whom the Georgia decree had awarded her and from whom the father had taken the child) solely because of lack of a showing of *changed* conditions; he did not have the law problem presented here, *because all the parties before him were then, and thereafter* continuous residents of this State. Justice NORTON had said (p. 630) : " The jurisdiction of this court to pass upon the question of the custody of the child depends upon the *residence of the child* and *not* the domicile of the parents. (*Matter of Hubbard,* 82 N. Y. 90; *Finlay* v. *Finlay,* 240 N. Y. 429). The child being a resident here is a ward of this state and the court can assume jurisdiction regarding her custody." (Emphasis supplied.)

He then proceeded to discuss the factual question of what was best for the child, saying (p. 631) that the foreign " decree may not be changed or modified by our courts, unless circumstances or treatment of the child *since* the decree render it necessary for the child's best interests," (italics supplied) citing *Ansorge* v. *Armour* (267 N. Y. 492). As a result of his opinion of the *factual* evidence, and the prospects offered to the child by her father, compared to those offered if she remained with her mother, Justice NORTON decided that there was no such *factual foundation* as to *change,* etc., as the *Ansorge* case (*supra*) required for action; he honored the foreign decree and gave the child back to the mother. Upon appeal the court awarded the child to the father (*Matter of Young* v. *Roe,* 265 App. Div. 858, affd, 290 N. Y. 823) and did so solely *on the fact that under the then conditions the child's best interests would be served by her living with the father.* The Appellate Division thus disagreed with his *factual findings but did not question the soundness of his law statement;* they said that this court " is not without power to make a different award if *intervening and current circumstances have changed*" (p. 858, italics supplied); they held

upon the evidence, that *factually* life with the mother did not give the child " a suitable degree of domestic and financial security ", and gave the child to the father; because " of the *separate residences of the parents in different states* provisions for divided custody or visitation " were not made, but might be applied for " *if it becomes practicable* " (265 App. Div. 858; italics supplied).

The memorandum of the Court of Appeals decision (290 N. Y. 823, 824) stated: " The legal problem presented was whether, *since* the Georgia decree, there had been such a *change* in ' circumstances or treatment ' affecting the child as required for her best interests a change in her custody (*Ansorge* v. *Armour*, 267 N. Y. 492; *People ex rel. Herzog* v. *Morgan*, 287 N. Y. 317)." (Emphasis supplied.) They did not disturb the *discretionary factual finding* of the Appellate Division that the child would be better off with the father; they did not have any *law* question before them (since the child *still* resided in New York) and naturally affirmed this discretionary order. The soundness of the quoted language of NORTON, J., was not questioned.

How that case is of value to the mother here is not apparent; it seems to emphasize that the child *must be in this State to be the subject of an order changing the foreign decree* and that any attempt to alter it must show such *changes since the decree* as require modifying it for the good of the child; thus the burden is upon the *respondent* here to show such *post-decree* changes, and that the present good of a child *not present* requires a modification. *Matter of Young* v. *Roe* (*supra*) thus supports the father here, i.e., that for New York to override a foreign decree *the child must be here.*

*The Authorities Cited by the Appellate Division for the Guidance of the Special Term at the Resumed Hearing Do Not Relate to Nonresident Children.*

The *Hubbard* decision cited (*Matter of Hubbard*, 82 N. Y. 90, 93) repeats that it is the *residence* of the infant " within the jurisdiction of the court where the proceedings are taken," rather than the *domicile* of the infant that decides whether that court has custody jurisdiction; it also emphasized that jurisdiction will not be entertained where the residence is achieved by *wrongful conduct* on the part of the one who brings the child into the State *for the purpose of giving possible jurisdiction.*

In *Finlay* v. *Finlay* (240 N. Y. 429), the court, repeating the *Hubbard* holding (*supra*) emphasized that it can intervene *only*

*when intervention is necessary for the welfare* of the child, and that the residence of the child *here* is the *foundation of jurisdiction.*

The *Ansorge opinion* (*Ansorge* v. *Armour,* 267 N. Y. 492, *supra*) emphasized that the child is a ward of this court *only when the child is in this State; there* it cautioned this court not to attempt to change the custody of the child merely because the court does not agree with the decree of the foreign court, but to act only if it is " necessary for the child's best interests," but that *until " such facts appear "* our courts cannot change the *foreign decree.* (P. 499; italics supplied.) It is also said that the welfare of the child requires a change in custody *only if it is due to subsequent events or conditions,* and that the one who seeks to change the lawful custody has the " burden of proving facts showing   *   *   * necessity for a change in the custody of the child." (P. 501.) The whole New York doctrine of " change " is summed up: " The Nevada decree stands as binding upon these parties until it is shown *that since such decree* circumstances have so *changed* that the welfare of the child demands a shift in custody." (P. 501; italics supplied.)

In the *Herzog* case (*People ex rel. Herzog* v. *Morgan,* 287 N. Y. 317, *supra*), the court cited *Finlay* v. *Finlay* (*supra*), applied it, and indicated the kind of evidence required for a change of custody: " ' There is no claim   *   *   * that the father was ever cruel *to the children* or *neglectful or unmindful of them,* and on the other hand it is well established that he has a great love for them   *   *   *.' " (P. 321; italics supplied.)

A careful search does not show any New York case holding that after a foreign decree gives the child to one parent, the other residing in this State, may try here the question of custody *when the child is not then in this State;* that may be because it is axiomatic that it cannot be done so no one has attempted it. Justice NORTON stated the rule in the beginning of his opinion in *Young* v. *Roe* (*supra*) as if it were a truism.

If it is possible to do that New York courts may be flooded with such applications if the successful party in the foreign court should venture into New York even in transit, and be served with a writ, *though the child is still outside the State.* The logic of permitting that seems to have no end since if, after a foreign decree giving the foreign-residing child to the foreign-residing parent the New York parent should learn that the other parent was on a train going through New York into another State, she might enter the train, and serve him with a

writ, *and this court be expected to adjudicate, on the merits, the custody of a child who may never have been in this State and may not ever come here.*

The following cases, not really in point, are cited merely to show how little ground there is for the mother's position on this point; they are in chronological order.

1898: The *Winston* case (*People ex rel. Ludden v. Winston,* 34 Misc. 21, affd. 61 App. Div. 614 [1901]) seems to be partly in point in the present case; there the Special Term, following *People ex rel. Billotti v. New York Juvenile Asylum* (57 App. Div. 383) held that having jurisdiction of the parent who had control of the child made it unimportant whether the child was out of the State or not. However, on a former appeal (*People ex rel. Winston v. Winston,* 31 App. Div. 121, 123 [1898]) the Appellate Division had reversed Special Term *on the ground that the child was not in this State as alleged in the petition,* but was living in New Jersey "the home of the respondent to the writ and has been so living with the respondent " for sometime and that " the said infant is not and has not been a resident of the State of New York since the last-mentioned date." Near the end of the opinion which discloses a situation somewhat like that presented here, it was said (p. 124): " It was also error for the court to award the custody of the child to a party to the proceeding without the child being before the court." Throughout the opinion it seems evident that the presence of the child before the court is meant to mean physical presence, or physical presence in the State, but not theoretical or constructive presence.

1901: In *People ex rel. Dunlap v. New York Juvenile Asylum* (58 App. Div. 133), the mother had surrendered the child to the care of the asylum for two years, and before the expiration " the child was indentured " to a resident of Illinois; after the two years expired the mother obtained the writ. The asylum answered that the child was out of the State, and seemed to have shown its inability to procure her return; the Special Term order that it do so was reversed. Although the *Billotti* case (57 App. Div. 383, *supra*) was cited in both opinions the reversal was because of the failure of Special Term to take proof on the alleged unwillingness of the child to return and as to who had custody. The earlier case, about which they differed (*People ex rel. Billotti v. New York Juvenile Asylum, supra*) was a father's application to compel the asylum to return his children; although that court divided, three to two, the majority

said that there was no division of opinion as to the law, and that if the respondent " has the custody or control of the person whose release is sought, so that it is possible for him to obey the order of the court with respect to that person, the court has jurisdiction ❋ ❋ ❋ to require the delivery of such person; and this can be done, although it appears that the person whose release is sought is without the State " (pp. 383–384) and that section 2015 of the Code of Civil Procedure (then providing that a writ is to be limited to a person " within the State ") has been extended by the courts to cover " a person who is not within the State if the defendant to whom the writ is addressed has the power to produce him, and subject him to the power of the court." (P. 384.) The respondent having proved that the children had been indentured to someone in Illinois " over whom this court has no jurisdiction, over whom the defendant has no power, and that these persons refuse to produce the children or send them back into this State " (p. 385), the granting of the writ was reversed. Despite the alleged *agreement* on the law, the dissenting justices discussed it fully and instead of agreeing with the majority, said (p. 388): " There is a great deal to be said on both sides of this subject " citing authorities; one of them was *Matter of Jackson* (15 Mich. 417, 420) where the court was equally divided on the power to order the bringing of a child outside the State.

1905: *People ex rel. Duryee* v. *Duryee* (109 App. Div. 533): The father obtain a writ directing the mother to produce the child; it appeared that after the parents separated the mother went to Rhode Island with this, and other children, " where, according to her contention, she obtained a residence for herself and them, and in June, 1900, an absolute divorce from the relator, the decree in that action awarding her the custody and control of the children." (P. 533.) She later took them to Italy " where they have since remained and where they were in a convent at the time this proceeding was instituted ❋ ❋ ❋ that since the separation took place she has supported all of said children and has had the sole care and custody of them." (P. 534.) The unanimous opinion has two grounds for dismissing the writs (1) the fact that the child's education should not be thus interfered with, and (2) that " it might well be doubted under the decision in *People ex rel. Winston* v. *Winston* (31 App. Div. 121) whether the court had any jurisdiction to adjudicate as to the custody of the child." (P. 534.) The court cited the conflicting decisions (*People ex rel. Billotti* v. *New York Juvenile*

*Asylum,* 57 App. Div. 383, *supra,* and *People ex rel. Dunlap* v. *New York Juvenile Asylum,* 58 App. Div. 133, *supra*) but did not decide the legal question because *that factual situation* required a dismissal of the writ.

1931: *May* v. *May* (233 App. Div. 519) (which was decided before the present form of section 235 of the Civil Practice Act existed and seems not now to be the law) does contain a discussion of principles worthy of note, but the decision, on the facts, does not favor the mother here.

The respondent father, suing in separation a wife who had gone to Nevada with their child, sought custody, and it was decided that the court had jurisdiction of the *case* but had no jurisdiction of the *person,* and hence may not proceed in personam; it has jurisdiction of the marital status, may adjudicate in respect to it, but that an ex parte order in the separation suit giving the child to the father was improper because " *neither the defendant mother nor the infant child* was within the jurisdiction or before the court." (P. 521; italics supplied.)

*Power of the Special Term to Now Make a Custody Order Herein.*

The foregoing findings of the evidence herein, and the conclusions as to its meaning, assume that this court still has jurisdiction to make an award of custody, from the standpoint of the child's *present* best interests; the factual evidence was taken pursuant to directions which were based upon cited authorities which give the court of the State *wherein the child now resides* the same power to now review the custody problem as would now be possessed by the foreign decree court.

The order of June 29, 1949, presented to the Appellate Division for consideration by the appeal, was made at a time when the child *was physically out of the State* namely, in Connecticut, but was technically in the custody or possession of a resident of New York; it was made when it was *believed* that the child was physically in New York, where her mother also was *supposed* to be.

It is elementary that no state of facts arising *after* the making of an order appealed from, *and not contained in the record on appeal,* is deemed within the scope of the decision and order on that appeal; it seems obvious that the reversal memorandum was predicated *on the assumption that the child would continue to be in the State after the appeal.* The bond, that was given by the father in August, before the appeal was argued, merely placed the child *at the direction of the court after the appeal should have been decided.*

However, the Appellate Division made no direction concerning the custody, refused to order the father to return her to New York or *even to bring her to the adjourned hearing*. The court remitted the *entire* question to Special Term to hear both sides. There is nothing in the memorandum to indicate that the court considered what took place between the parties in August, or the *fact* (referred to in one of the briefs) that the child *had gone back to Florida with her father*. Orderly and established procedure requires that the reversal order be read in the light of the situation *up to and including the order appealed from, and not otherwise;* when, as now appears, the situation was otherwise at the time of the resumption of these hearings (March, 1950) the child had *ceased to be a physical resident of New York* for *about seven months and* is still back with her father's permanent residence in Florida there seems to be no authority for the claim that this court *now* has any jurisdiction over her.

The reversal memorandum distinguished between *domicile* and *residence;* as appeared in the records before the court the *domicile* was always that of the father not only because a child's domicile is that of her father, but because she was taken without cause, without his consent, and without court permission from the place where (May 21, 1947) he was a permanent resident. Thereafter, adjudicating in 1948, the wrongfulness of that taking, the court of her father's domicile (which was still also her domicile under Florida law) took cognizance of that domicile, and of her mother's baseless desertion, and wrongful taking, passed upon her custody, and awarded it to her father *even though she was known to be physically* (but unlawfully) *outside the State.* This was, plainly, because she was illegally taken outside, having been in law, " kidnapped ". It is elementary that no wife who takes a child from the father *lawfully* in charge of it can thereby change the child's domicile, or thereby acquire rightful possession, unless the father has forfeited the right to possession. The facts here are otherwise.

The foregoing discussion of the factual aspects of the instant case follows the pattern used by the undersigned in *People ex rel. McGrath* v. *Gimler* (60 N. Y. S. 2d 622, affd. 270 App. Div. 949; leave to appeal denied 270 App. Div. 1020). There, the *factual* discussion assumed, arguendo, that there was power to decide what *should* be done with the child from the standpoint of her good; then followed a discussion of the law; it was concluded that there was no power to make a change. The child was

thereupon taken from the mother (who lived in Brooklyn, who had custody of the child before and since the foreign decree, entered on consent of both parties gave her to the father) and restored to him. The affirmance did not state whether the order was upheld on *facts* or on the *law;* this court has been reliably informed by counsel in that case that, after both counsel conferred with Judge THATCHER, leave to appeal was denied, but not with any opinion that would explain whether the Appellate Division affirmance was deemed to be correct on the *law* or the *facts.* However, the Special Term stated, in the opinion, that the award was made *on the law.* There was in that case *no change since the decree;* the affirmance seems, therefore to be *on the law.*

It would seem that in strict logic (if there is any logic in the immense mass of matrimonial decisions that are supposed to be consistent) our courts should not, after a decree which established the wrongfulness of the mother's departure, and the wrongfulness of her taking the child, the wrongfulness of her keeping it in this jurisdiction away from the father, in defiance of the decree, question the propriety of the father's right to custody except when the child is *here,* and then *upon the most impressive testimony* of change or *present danger to the child.*

Therefore, when upon the evidence submitted, it cannot be said that there is any such evidence of change, or unfitness, past or present, on the part of the father that weakens the foreign decree nor any state of new facts which will justify New York in siding with one of her residents who has continued, since that decree, to defy its provisions, comity, if nothing else, should suggest that she go to the court that rendered that decree, first placing herself in good order by honoring it. Instead, she chose to continue to defy the decree, and since its rendition has taken no affirmative step by *evidence* to justify that defiance; when the matter was brought into this court, she fled the jurisdiction and hid the child and defied the June 24th order.

It is questionable whether this State ought to make itself a party to her attempt, under these circumstances, to continue her defiance of a constitutional decree which this State ought to be zealous to accept, as the Constitution requires. New York ought not to build up a reputation for being reluctant to obey the Constitution, and zealous in favor of those who defy it. Comity will again and again require New York to ask, for its

citizens, the recognition of their constitutional rights, in other States, and we ought to look ahead to the time when we might be met with the answer that we ought not to expect to receive what we will not give. One State has so built up the reputation for violating the constitutional rights of prisoners by cruel and inhuman punishment that courts, in this part of the country, have been most reluctant to honor extradition demands. A State can get itself a bad reputation by defying the Constitution, and be unable to get its constitutional rights recognized when it relies upon the Constitution, and seeks co-operation.

*The Conclusions and Decision Herein Are as Follows:*

1. The mother deserted the child's father on May 21, 1947, without cause and took the child without his permission or knowledge with her from the Florida home of the father, where he was a permanent resident, and brought the child to New York, all without right or authority.

2. The child thereafter still continued to be domiciled in Florida, where her father was domiciled and was continuously thereafter constructively in his custody, including the date that the decree was rendered in his favor, so the award of the child's custody to him was legal and valid, and has at all times since that date been legally effective and operative.

3. That prior to the said unauthorized taking of the child the best interests of the child were being served by the home where she was then living, and she was brought to New York to live under surroundings that were not beneficial to her, not as good as those that she was taken from, were destructive of her well-being, and her best interests required at all such times that she be returned to her father.

4. From the time she was thus brought to New York until she was surrendered to him in August, 1949, said unsatisfactory and harmful conditions surrounding her in her residence in New York continued to her detriment, being the unavoidable consequences of her mother's wrongful taking of her from a good home and bringing her into an environment that was not good, arising from her mother's inability to care for her properly because she had not the means to support the child, and did not have the time to see her and care for her as she should have done, due to being employed during most of the working day.

5. That the best interests of the child are being served by having her remain with her father, and it would be definitely harmful to have her brought back to the unsatisfactory living

conditions shown in the testimony, from which the father thus took her in August, 1949.

6. That if the evidence referred to, and the fact that the child has thus been restored to her father, do not divest this court of jurisdiction to take testimony, in her absence, about proper guardianship of her, it should be, and it is, now decided as a fact that the father is the better custodian, the mother is not a good guardian, and that the best interests of the child are being served by having her stay with her father in Florida, subject to any application that the mother may make to the said Florida court, for the modification of the 1948 decree, but that her cross application should be, and it is, dismissed on the merits.

7. That if, on the law, this court has lost jurisdiction of the child, or of the subject of her custody, the cross claim or petition of the mother should be dismissed on the legal merits, without prejudice to her remedies in the court that rendered that decree.

8. That if the departure of the child, as aforesaid, from this State and her continuous residence in Florida since August, 1949, has the effect of divesting this court of jurisdiction, the proceeding itself should now also be dismissed without prejudice, because (1) the question sought to be decided herein has become academic, and (2) it is not the function of this court to confirm foreign decrees, but rather to render no decision under these circumstances when the question of custody has been legally and duly adjudicated by a State decree to which this court is obliged to give full faith and credit.

Submit order, on notice, denying the mother's application on the merits, and dismissing the proceeding on the ground that the relief for which the proceeding was brought has since been legally obtained by the father, and the question of custody has become academic because the Florida decree is still in effect.